[Cite as *State v. Catney*, 2017-Ohio-90.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 104141**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JARON A. CATNEY

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-594446-A

**BEFORE:** E.A. Gallagher, J., Keough, A.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** January 12, 2017

**ATTORNEY FOR APPELLANT**

Britta M. Barthol
P.O. Box 670218
Northfield, Ohio 44067


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY: Marcus A. Henry
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN A. GALLAGHER, P.J.:

**{¶1}** Defendant-appellant Jaron Catney appeals his convictions for attempted rape, kidnapping, gross sexual imposition, aggravated burglary, robbery, attempted burglary and menacing by stalking in the Cuyahoga County Court of Common Pleas. For the following reasons, we affirm.

**Factual and Procedural Background**

**{¶2}** Catney was charged by the Cuyahoga County Grand Jury with attempted rape, kidnapping with a sexually violent predator specification, two counts of gross sexual imposition, two counts of aggravated burglary, robbery, attempted burglary and menacing by stalking.

**{¶3}** The case proceeded to a bench trial where A.B. testified that an intruder entered her home on Wyandotte Avenue in Lakewood, Ohio on July 22, 2013, between the hours of 1:30 and 3:30 a.m. A.B. described the intruder as an African American male with long hair in dread locks or braids. He was roughly six feet tall with a deep voice and a strong odor of alcohol on his breath. A.B. had never seen the man before and, because the lighting was dark, she was unable to see his face.

**{¶4}** The intruder entered her bedroom where she was sleeping with her 11 year old daughter, T.J. When A.B. asked the intruder who he was and what he was doing in her home, he replied, "Shut up. Just roll over." Fearful for her daughter's safety, A.B. complied. The man climbed on top of her, pinned her arms above her head and unsuccessfully attempted to penetrate her anus with his penis.

**{¶5}** During this interaction, T.J. snuck out of the bedroom in an attempt to seek help. The intruder forced A.B. to call for T.J. to return by threatening to hurt both of them if she refused to comply. The intruder also asked A.B. if she had money in the home and told her that his brother was going to take her microwave and possibly her television. Neither were actually taken and A.B. did not see a second intruder.

**{¶6}** When the intruder was unable to penetrate her anally, he stood at the side of the bed and forced her to masturbate his penis under threat of harm. When he was finished he said "Okay. I'm done" and left the home.

**{¶7}** A.B. contacted the Lakewood police and provided them with the aforementioned description of the suspect. A.B. was unable to provide police with a description of the man's facial features. The police attempted to collect a DNA swab from A.B.'s arm to identify the intruder but the sample was contaminated by the collecting officer. The point of entry was attributed to A.B.'s unlocked front door.

**{¶8}** On October 26, 2014, A.B. was asleep with her daughter in her daughter's room when she was awakened by the sound of the floor creaking in her dining room. She observed an intruder pass through the dining room doorway and enter her bedroom. Seeking help, she used her cellular phone to call her mother. Finding A.B.'s bedroom unoccupied, the intruder entered T.J.'s room and asked A.B. if she was awake. A.B. believed the intruder to be the same man from the July 2013 incident. When A.B. confronted him as to why he was in her home again, he replied, "Just roll over and lets get this over with. You know what to do." A.B. pushed the man away with her right hand

while holding her cell phone with her left hand. The intruder attempted to grab the cell phone away from her and they struggled for five to ten minutes before he left.

{¶9} A.B. described the intruder as having the same voice as the intruder from the July 2013 incident. He also had the same hair length and style as the prior intruder and the same strong smell of alcohol on his breath. A.B. testified at trial that the lighting during the incident on October 26, 2014, provided her a view of the intruder's face and she identified Catney as the intruder. However, a 911 recording from the incident revealed that A.B. reported she could not see the intruder's actual face because it was "blackened out."

{¶10} Lakewood police identified an open dining room window on the south side of A.B.'s home as the intruder's point of entry. A garbage can had been turned upside down beneath the window that provided the intruder access. Police swabbed the window for DNA and found a match to Catney's DNA on the storm window and window screen.

{¶11} Before the DNA testing was complete, a third incident occurred on December 23, 2014. A.B. returned to her home to discover the storm windows in her front window and south dining room window pushed up and tampered with. She had not given anyone permission to tamper with her storm windows. A.B. reported the incident to Lakewood police who were unable to obtain fingerprints from the windows. However, a neighbor, Craig Ziganti, informed the investigating officer that on a prior night he had observed a black male with long hair attempting to enter A.B.'s home. The

male circled A.B.'s home, knocking on windows and tried to open the door. The male went out of Ziganti's view on the south side of the home that was the same side featuring the dining room windows that had been identified as the intruder's point of entry on October 26, 2014.

{¶12} A.B. met with Lakewood police detective Raymond Fuerst, Jr. in March 2015 after the results of the DNA testing from the October 26, 2014, incident were known. Fuerst showed A.B. two photos of Catney— one from the Burea of Motor Vehicles and another taken at the Cuyahoga County jail. Fuerst testified that his purpose for showing the photos to A.B. was not to obtain an identification but to learn whether Catney had any reason to be touching the windows of A.B.'s home where his DNA was recovered. A.B. reacted to the photos by crying and identifying Catney as the intruder. This identification evidence was admitted at trial over the objection of Catney.

{¶13} The trial court found Catney guilty on all counts.

{¶14} The case proceeded to a bifurcated trial on the sexually violent predator specifications attached to the attempted rape and kidnapping counts. The following evidence was offered.

{¶15} P.T. testified that in March or May 2013 she was stalked by Catney while she lived on West 98th Street in Cleveland. Catney would come to her home three to four times a week, knock on her windows, pound on her front door, try to push past her air conditioner to enter her room and masturbating outside. At one point he spoke to P.T. through her window and stated, "I'm not trying to hurt you, I just want some of your

sweet [buttocks]." Catney would always disappear after P.T. called the police. Frustrated that police were not taking her repeated complaints seriously, P.T. installed a security camera and captured footage of Catney's activity on film. Security footage depicting Catney repeatedly appearing outside P.T.'s home and attempting to peer inside her window was played at trial.

{¶16} Catney was identified based on the security footage, arrested and convicted of menacing by stalking and voyeurism. Leslie Svoboda, Catney's probation officer, testified that he was at the Community Based Correctional Facility in Bowling Green, Ohio from March 27, 2014, until August 29, 2014. Upon release he was ordered to participate in sex offender treatment programs from October 22, 2014, through January 28, 2015. During this time, the October 26, 2014 incident at A.B.'s home occurred.

{¶17} The trial court found Catney to be a sexually violent predator.

{¶18} At sentencing, the trial court merged Catney's attempted rape and one of his gross sexual imposition counts into the kidnapping count. The court also merged Catney's menacing by stalking count into his aggravated burglary and attempted burglary counts. The trial court imposed prison terms of 11 years to life on the kidnapping charge, 18 months on the remaining gross sexual imposition charge, eight years on each count of aggravated burglary, three years on the robbery count and three years on the attempted burglary count. All counts were ordered to be served concurrently. The trial court also found Catney to be a tier 3 sex offender.

**Law and Analysis**

**I.  The Trial Court's Denial of Catney's Motion to Suppress the Identification   Testimony was Harmless**

{¶19} In Catney's first assignment of error he argues that the trial court erred in denying his motion to suppress the identification testimony due to the unduly suggestive and unreliable pretrial and in-court identifications.  Catney argues that A.B.'s pretrial identification was tainted by Detective Fuerst's unnecessarily suggestive photograph procedure that failed to conform to R.C. 2933.83, which governs the administration of photo lineups.

{¶20} We find Catney's argument to be moot.  Even accepting Catney's proposition that the trial court erred by denying his motion to suppress the identification testimony, any error was harmless as a matter of law because the trial court specifically explained that it did not find A.B.'s identification testimony to be credible.  The trial court noted that A.B. had admitted that the intruder's face was blacked out and she could not provide a description of his facial features.

{¶21} Instead, the trial court based its conclusion that Catney was the intruder in this case on other evidence:

So let's look at everything else. What is the strongest evidence for the State is the circumstance of each intrusion was middle of the night, in a bedroom, with the intruder searching for the person or persons they're after. It was telling to me that on the second intrusion A.B. said that the intruder first went to her bedroom, a different bedroom, and then doubled back as if remembering where he ought to be able to find her. It is telling that the

intruder used, according to A.B., very similar language each time about what he wanted her to do, and getting things over with, et cetera. It is very telling that the victim recognized the hair characteristics and a deep voice that the intruder had.

So there was a lot of evidence to help the Court conclude that the intruder on these first two occasions, July 13, October 14, is the same person.

And then we come to the DNA evidence that puts Mr. Catney's DNA on the screen window and the storm—  the screen of a window and a storm window in October of 2014 and there is just no evidence that explains what his DNA would be doing there. And it is interesting to me that this is exactly like a rape case in the sense that we have the unexplained presence of some person's DNA inside somebody's vagina. It's the same thing here. The difference, of course, is that this is a storm window exposed to the outside world as opposed to a vagina. But we did have evidence that says, DNA is not going to last very long on exterior surfaces subject to moisture, subject to aging, and sunlight, and so forth outside. I do not agree with Mr. DeFranco that the State had the obligation to try to exclude Mr. Catney as a person who was known to the homeowner of this property * * *, or to A.B.'s mother, and so forth and so on. The State doesn't have the burden to prove the negative.

So it is telling to the Court that there is—  there was no evidence presented by anyone that explains how Mr. Catney's DNA could be on these

windows. Now, we do not have any evidence of how the intruder gained entrance to the home in July of 2013. We have ample evidence that a window was used in October of 2014. We have, of course, the picture of that, we have the telltale garbage can turned upside-down, and we have the DNA. So at that point the Court is very comfortable concluding that it's been proven beyond a reasonable doubt that Mr. Catney is the intruder in both the July and -- '13 and the October '14 event.

{¶22} The trial court further concluded that Catney was the perpetrator of the December 23, 2014 offenses based on the description provided by Mr. Ziganti and the similar nature of the conduct observed to the conduct in the October 26, 2014, incident.

{¶23} An error in the admission of evidence is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction. *State v. Lytle*, 48 Ohio St. 2d 391, 358 N.E.2d 623 (1976), paragraph three of the syllabus. "Where constitutional error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 452 N.E.2d 1323 (1983), paragraph six of the syllabus.

{¶24} Because the trial court did not rely on the challenged testimony but instead based its identification conclusion on wholly unrelated evidence, we find any error in the admission of said testimony to be harmless.

{¶25} Catney's first assignment of error is overruled.

## II. Sufficiency of the Evidence

{¶26} In Catney's second assignment of error he argues that the evidence was insufficient as a matter of law to support a finding beyond a reasonable doubt that he was

guilty of robbery, attempted burglary and the sexually violent predator specifications attached to the attempted rape and kidnapping counts.

{¶27} This court has said that, in evaluating a sufficiency of the evidence argument, courts are to assess not whether the state's evidence is to be believed but whether, if believed, the evidence against a defendant would support a conviction. *State v. Givan*, 8th Dist. Cuyahoga No. 94609, 2011-Ohio-100, ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry then is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id*.

**A. Robbery**

{¶28} Catney argues that the state failed to offer sufficient evidence of an attempted theft offense to support his conviction for robbery. Pursuant to R.C. 2911.02(C)(2), a violation of any of the theft statutes enumerated in R.C. 2913.01(K) can serve as the underlying "theft offense" to a charge of robbery. Here, the applicable theft statute is R.C. 2913.02(A), which provides:

> No person, with purpose to deprive the owner of property or services, shall
>
> knowingly obtain or exert control over either the property or services in any
>
> of the following ways:
>
> (1) Without the consent of the owner or person authorized to give consent;

R.C. 2913.02(A).

**{¶29}** The intent required to commit a theft offense "may be inferred from the circumstances surrounding the crime." *State v. Fasino*, 8th Dist. Cuyahoga No. 101788, 2015-Ohio-2265, ¶ 15, quoting *State v. Herring*, 94 Ohio St.3d 246, 266, 2002-Ohio-796, 762 N.E.2d 940; *State v. McGowan*, 8th Dist. Cuyahoga No. 96608, 2011-Ohio-6166, ¶ 36. "Because intent dwells in the mind of the accused," *Fasino* at ¶ 15, citing *State v. Treesh*, 90 Ohio St.3d 460, 484-485, 739 N.E.2d 749 (2001), it is "not susceptible of objective proof" and must be "gathered" and inferred from the act itself, the manner in which the act is done, the means used and all of the other surrounding facts and circumstances. *See*, *e.g.*, *State v. Garner*, 74 Ohio St.3d 49, 60, 656 N.E.2d 623 (1995); *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293 (1990).

**{¶30}** A.B. testified that during the October 26, 2014 incident she and Catney engaged in a five to ten minute struggle wherein Catney attempted to gain possession of her phone. We conclude the state offered sufficient evidence of an attempted theft offense to support Catney's conviction for robbery.

### B. Attempted Burglary

**{¶31}** Catney next argues that the state failed to present sufficient evidence to support his conviction for attempted burglary relating to the December 23, 2014 incident. Catney's challenge to this conviction is limited to the element of identity. Because he does not contend that the state failed to establish any of the other elements of the crime for which he was convicted, we limit our analysis to whether the evidence was sufficient to establish, beyond a reasonable doubt, that Catney was the individual responsible for

tampering with A.B.'s windows and door and attempting to enter her home on December 23, 2014.

**{¶32}** We find no merit to Catney's argument. It is true that the state was unable to provide DNA or fingerprint evidence linking Catney to the December 23, 2014 offense. However the state introduced the eyewitness testimony of Mr. Ziganti who observed a male matching Catney's description attempting entry of A.B.'s home and tampering with her windows and front door in a manner consistent with the prior incidents of July 22, 2013, and October 26, 2014. In fact, the same south-facing window identified as the point of entry for the October 26, 2014 incident was tampered with on December 23, 2014. Coupled with the DNA evidence physically linking Catney to the window intrusion of the home on October 26, 2014, we find that the state offered sufficient evidence identifying Catney as committing the attempted burglary on December 23, 2014.

### C. Sexually Violent Predator Specifications

**{¶33}** Finally, Catney argues that the state failed to offer sufficient evidence to support his conviction under the sexually violent predator specifications attendant to the attempted rape and kidnapping counts.

**{¶34}** If an offender is charged with a violent sex offense, the indictment may contain a specification that the offender is a sexually violent predator. *See* R.C. 2941.148(A). Under R.C. 2971.01(H), a "sexually violent predator" means a person who "commits a sexually violent offense and is likely to engage in the future in one or more

sexually violent offenses." Catney argues that the state failed to present sufficient evidence that he is likely to engage in further sexually violent offenses in the future. R.C. 2971.01(H)(2) provides a nonexclusive list of factors to be considered as evidence tending to indicate that there is a likelihood that an individual will engage in sexually violent offenses in the future:

> (a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.

> * * *

> (f) Any other relevant evidence.

{¶35} The state correctly argues, and Catney concedes, sufficient evidence was presented that Catney had previously been convicted of a sexually oriented offense, to-wit, voyeurism, in a separate criminal action. *See* R.C. 2950.01(A). Coupled with the sexually oriented offenses of attempted rape and kidnapping with a sexual motivation in this case, the state presented sufficient evidence to establish the factor under R.C. 2971.01(H)(2)(a) above.

{¶36} Furthermore, the state presents a compelling argument under the "other relevant evidence" factor of R.C. 2971.01(H)(2)(f). Catney committed the October 26,

2014 and December 23, 2014 offenses while participating in a sex offender treatment program stemming from his prior convictions.

**{¶37}** Under these facts we find that the state presented sufficient evidence that Catney is likely to engage in further sexually violent offenses in the future.

**{¶38}** Catney's second assignment of error is overruled.

### III.   Manifest Weight

**{¶39}** In his final assignment of error, Catney argues that all of the    convictions in this case were against the manifest weight of the evidence.

**{¶40}** A manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion at trial. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *State v. Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541; *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree  with the factfinder's resolution of conflicting testimony. *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 485

N.E.2d 717 (1st Dist.1983). In conducting such a review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraphs one and two of the syllabus. Reversal on manifest weight grounds is reserved for the "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *Martin*, *supra*.

{¶41} Catney reiterates the arguments addressed in the second assignment of error and again maintains that the trial court lost its way in deciding the issue of identity in this case. For the same reasons addressed in the second assignment of error above and detailed in the trial court's factual findings regarding identity, we cannot say this is the exceptional case mandating reversal.

{¶42} Catney's third assignment of error is overruled.

{¶43} The judgment of the trial court is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
MARY J. BOYLE, J., CONCUR